UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARK RUBENSTEIN,<br><br>                    Plaintiff,<br><br>          -v.-<br><br>COSMOS HOLDINGS, INC.,<br><br>                    Nominal Defendant,<br><br>          -and-<br><br>GRIGORIOS SIOKAS,<br><br>                    Defendant. | 19 Civ. 6976 (KPF)<br><br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

Plaintiff Mark Rubenstein brings this action pursuant to Section 16(b) of the Securities Exchange Act of 1934, as amended (the "1934 Act"), 15 U.S.C. § 78p(b), on behalf of nominal defendant Cosmos Holdings, Inc. ("Cosmos"). He alleges that Defendant Grigorios Siokas, an officer, director, and beneficial owner of more than 10% of Cosmos, violated the short-swing profits provision of Section 16(b) when he sold Cosmos common stock within a six-month period of his wife's purchase of Cosmos common stock from an unaffiliated third party. Plaintiff seeks disgorgement of any short-swing profits realized by Siokas, for the benefit of Cosmos. Together, Siokas and Cosmos ("Defendants") move to dismiss the Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), or alternatively, move for a judgment on the pleadings pursuant to Rule 12(c). For the reasons explained below, Defendants' motion to dismiss is denied.

**BACKGROUND**[1]

A.   **Factual Background**

The Court accepts as true the well-pleaded allegations of the Complaint for the purposes of this motion.  Plaintiff owns securities in Cosmos, a pharmaceutical company whose common stock is traded on an over-the-counter securities market, the OTCQB market.  (Compl. ¶¶ 2-3).  Siokas is an officer, director, and beneficial owner of more than 10% of Cosmos common stock.  (*Id.* at ¶ 6).  Plaintiff brings this action for the benefit of Cosmos, which is named as a party defendant solely to have all necessary parties before this Court.  (*Id.* at ¶ 5).

At all relevant times, Siokas was married to Ourania Matsouki.  (Compl. ¶ 12).  The Complaint alleges that on October 2, 2017, Matsouki entered into a purchase agreement (the "Purchase Agreement") with an unrelated third party, Vasileios Mavrogiannis, to buy 100,000 post-split shares of Cosmos common stock (the "Matsouki Purchase").  (*Id.* at ¶ 10; *id.*, Ex. A).  Plaintiff alleges that the purchase price was $2.20 per share, amounting to a total purchase price of $22,000.  (*Id.*).[2]  Before the Purchase Agreement was executed, Matsouki had

---

[1]     The facts in this Opinion are drawn primarily from Plaintiff's Complaint ("Complaint" or "Compl." (Dkt. #1)), which is the operative pleading in this case, as well as its attached exhibits, Matsouki's Stock Purchase Agreement (the "Purchase Agreement" (Dkt. #1, Ex. A)) and Matsouki's Rescission Agreement (the "Rescission Agreement" (Dkt. #1, Ex. B)).

For ease of reference, the Court refers to Defendants' opening brief as "Def. Br." (Dkt. #22); Plaintiff's amended opposition brief as "Pl. Opp." (Dkt. #29); and Defendants' reply brief as "Def. Reply" (Dkt. #37).

[2]     The Court notes that Plaintiff's math is suspect.  Plaintiff alleges that Matsouki purchased 100,000 post-split shares of stock for $22,000.  (Compl. ¶10).  If true, the price per share would be $0.22, not $2.20.

paid Mavrogiannis the purchase price and completed all other obligations and preconditions described in the Agreement. (*Id.* at ¶ 11).

Within six months of October 2, 2017, Siokas sold 100,000 shares of Cosmos common stock through eight open-market sales (the "Siokas Sales"). (Compl. ¶ 13). Utilizing the "lowest in – highest out within six months" method, Plaintiff estimates that Siokas profited in the amount of $865,839.50 from these sales, after subtracting the total price of the Matsouki Purchase. (*Id.* at ¶ 14).

On January 14, 2019, Plaintiff made a demand on the Board of Directors of Cosmos for the recovery of any short-swing profits realized by Siokas from the Matsouki Purchase and the Siokas Sales. (Compl. ¶ 15). More than 60 days passed, and Cosmos did not act on Plaintiff's demand. (*Id.* at ¶ 8). In fact, Cosmos stated that it did not believe a recovery was warranted. (*Id.*). Then, on May 29, 2019, Matsouki entered into a rescission agreement (the "Rescission Agreement") with Mavrogiannis purporting to nullify the Matsouki Purchase *ab initio* and *nunc pro tunc.* (*Id.* at ¶ 17; *id.*, Ex. B). Siokas provided the Rescission Agreement to Plaintiff on that same day. (*Id.*). To date, Cosmos has not recovered any of the alleged short-swing profits. (*Id.* at ¶ 19).

## B.   Procedural History

Plaintiff filed the Complaint in this action against Defendants on July 25, 2019, seeking to have Siokas account for and pay over the short-swing profits he allegedly realized and retained in violation of Section 16(b). (Dkt. #1). On October 22, 2019, prior to service upon Siokas, Cosmos filed a letter seeking a

conference in anticipation of filing a motion to dismiss.  (Dkt. #9).  On October 25, 2019, Plaintiff responded to Cosmos's pre-motion conference request.  (Dkt. #11).  The Court held a pre-motion conference on November 26, 2019, and set a briefing schedule.  (Dkt. #15 (transcript)).  On January 2, 2020, Cosmos filed a letter to confirm that Siokas had been served and would be represented by Cosmos's counsel, and that together, they would move to dismiss this action.  (Dkt. #16).

Defendants filed their motion to dismiss Plaintiff's Complaint and supporting memorandum on February 27, 2020.  (Dkt. #21-22).  Plaintiff filed its first memorandum of law in opposition to Defendants' motion on March 5, 2020.  (Dkt. #26).  On March 6, 2020, Plaintiff requested leave to file an amended opposition brief.  (Dkt. #27).  The Court granted Plaintiff's request on March 11, 2020.  (Dkt. #28).  That same day, Plaintiff filed its amended opposition to the motion to dismiss.  (Dkt. #29).  The motion became fully briefed and ripe for review when Defendants filed their reply brief on April 16, 2020.  (Dkt. #37).

## DISCUSSION

Plaintiff's Complaint is styled as presenting three claims for relief.  *First*, Plaintiff alleges that the Matsouki Purchase and the Siokas Sales gave rise to short-swing profits in violation of Section 16(b) that are recoverable by Plaintiff on behalf of Cosmos.  *Second*, Plaintiff alleges that the purported rescission of the Matsouki Purchase does not extinguish Siokas's Section 16(b) liability.  *Third*, Plaintiff alleges that profits are recoverable from any additional matching

4

transactions of Cosmos equity securities or equity security equivalents made by Siokas during periods not barred by the statute of limitations and within periods of less than six months of each other. Defendants move to dismiss the Complaint in its entirety, arguing that because the Rescission Agreement voided the Purchase Agreement: (i) there was no matching sale and purchase of Cosmos stock and (ii) Siokas did not realize a profit that could be disgorged to Cosmos.[3]

## A.  Applicable Law

### 1.  Motions to Dismiss Under Rule 12(b)(6)[4]

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "draw all reasonable inferences in Plaintiff's

---

[3]  Plaintiff claims Cosmos has no standing to support Siokas against a shareholder claim brought against him in Cosmos's favor, because it was accorded the right to prosecute and declined to do so. (*See* Pl. Opp. 3-7). The requirement that a party establish its standing to litigate applies not only to plaintiffs but also defendants. *Yellow Pages Photos, Inc.* v. *Ziplocal, LP*, 795 F.3d 1255, 1265 (11th Cir. 2015) (citing *Arizonans for Official English* v. *Arizona*, 520 U.S. 43, 64 (1997) (stating that "[s]tanding to sue or defend is an aspect of the case-or-controversy requirement" and "[s]tanding to defend on appeal in the place of an original defendant, no less than standing to sue, demands that the litigant possess a direct stake in the outcome")). However, Plaintiff's argument regarding Cosmos's standing is curious, as it was Plaintiff who decided to name Cosmos as a nominal defendant to the action. (Dkt. #1). Ultimately, the Court need not decide whether Cosmos has standing to bring a motion to dismiss the Complaint. The same motion is also brought by Siokas, who plainly has standing as a party against whom relief is sought. *Id.*

[4]  Defendants move in the alternative for a judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c). In addressing a Rule 12(c) motion, the court considers "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *Roberts* v. *Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009). The text of Rule 12(c) itself provides that it allows for the filing of a motion for judgment on the pleadings "after the pleadings are closed." Fed. R. Civ. P. 12(c). Here, however, Defendants have not filed an answer to the Complaint. Because the pleadings are not closed, Defendants' motion is properly brought pursuant to Rule 12(b)(6), but not Rule 12(c). Further, a Rule 12(c) motion will not be granted unless the movant clearly establishes that no material facts are in dispute and that judgment must be granted as a matter of law. *Rivera* v. *Schweiker*, 717 F.2d 719, 722 n.1 (2d Cir. 1983). At this stage,

favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). In addition to the text of the complaint, the Court may consider documents attached as exhibits, incorporated by reference, or that are "integral" to the complaint. *DiFolco* v. *MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).

A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge plaintiff's claims across the line from conceivable to plausible." (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 570)).

However, a court is not bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted); *see also Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is

---

Defendants cannot clearly establish that no genuine issue of material fact exists, thus a Rule 12(c) motion is procedurally improper.

inapplicable to legal conclusions, and threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice."

(internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678)).  Moreover,

"[w]here a complaint pleads facts that are 'merely consistent with' a defendant's

liability, it 'stops short of the line between possibility and plausibility of

entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at

557).

### 2.     Violations of Section 16(b)

Section 16(b) of the 1934 Act is an insider-trading statute that requires

statutorily defined corporate insiders to disgorge short-swing profits obtained

by trading in the securities of the corporation.  *Olagues* v. *Perceptive Advisors*

*LLC*, 902 F.3d 121, 125 (2d Cir. 2018).  It states in relevant part:

> For the purpose of preventing the unfair use of
> information which may have been obtained by [a
> corporate insider] by reason of his relationship to the
> issuer, any profit realized by [the insider] from any
> purchase and sale, or any sale and purchase, of any
> equity security of such issuer … within any period of
> less than six months … shall inure to and be
> recoverable by the issuer, irrespective of any intention
> on the part of [the insider].

15 U.S.C. § 78p(b).  The Second Circuit has made plain that Section 16(b), "a

vital component of the Exchange Act, [] was designed to prevent an issuer's

directors, officers, and principal stockholders from engaging in speculative

transactions on the basis of information not available to others."  *Donoghue* v.

*Bulldog Inv'rs Gen. P'ship*, 696 F.3d 170, 173-74 (2d Cir. 2012) (internal

quotation marks omitted).

As indicated by the "irrespective of any intention" clause, that section is a strict-liability provision; it "requires the inside, short-swing trader to disgorge all profits realized on all 'purchases' and 'sales' within the [six-month] period, without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information." *Roth* v. *Jennings*, 489 F.3d 499, 507 (2d Cir. 2007) (quoting *Kern Cty. Land Co.* v. *Occidental Petroleum Corp.*, 411 U.S. 582, 595 (1973)); *see, e.g.*, *Foremost-McKesson, Inc.* v. *Provident Securities Co.*, 423 U.S. 232, 251 (1976) ("Section 16(b) imposes a strict prophylactic rule with respect to insider, short-swing trading."). Thus, Section 16(b) was created as a "blunt instrument" to impose a form of strict liability, requiring no showing of actual misuse of inside information or of unlawful intent. *Donoghue*, 696 F.3d at 174 (citations omitted).

To state a claim under Section 16(b), a plaintiff must plausibly allege: (i) a purchase and (ii) a sale of securities (iii) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (iv) within a six-month period. *Olagues*, 902 F.3d at 125; *see also Chechele* v. *Sperling*, 758 F.3d 463, 467 (2d Cir. 2014); *Feder* v. *Frost*, 220 F.3d 29, 32 (2d Cir. 2000). "The statutory definitions of 'purchase' and 'sale' are broad and, at least arguably, reach many transactions not ordinarily deemed a sale or purchase." *Kern Cty.*, 411 U.S. at 593-94. Furthermore, "if [a] conversion can be paired with another 'sale' or 'purchase,' and the paired transactions occur within a six month period, the paired transactions are ... the type of insider activity that Section 16(b) was designed

to prevent." *Gibbons* v. *Malone*, 703 F.3d 595, 599 (2d Cir. 2013).

## B.    Analysis

### 1.    Plaintiff Has Stated a Claim Under Section 16(b) with Respect to the Matsouki Purchase and the Siokas Sales

It is undisputed that Plaintiff has plausibly alleged that Siokas was an officer, director, and beneficial owner of more than 10% of Cosmos common stock and is therefore a statutory "insider" for purposes of Section 16(b).  *See Donoghue*, 696 F.3d at 177 ("[P]ursuant to § 16(b), when a stock purchaser chooses to acquire a 10% beneficial ownership stake in an issuer, he becomes a corporate insider and thereby accepts the limitation that attaches to his fiduciary status: not to engage in any short-swing trading in the issuer's stock." (internal quotation marks, brackets and citation omitted)).  It is also undisputed that Siokas made eight open-market sales of Cosmos common stock within a six-month period of the October 2, 2017 Matsouki Purchase.

The question at hand is whether the Purchase Agreement was rescinded such that the Matsouki Purchase never occurred.  Defendants argue that such a rescission transpired either through: (i) Mavrogiannis's and Matsouki's abandonment of the Purchase Agreement; or (ii) the Rescission Agreement. (Def. Br. 8-11).  If Defendants are correct on either front, then Siokas did not purchase Cosmos stock within six months of the Siokas Sales and could not have realized a profit cognizable under Section 16(b).  (*Id.*).[5]

---

[5]    Defendants do not contest the presumption that Siokas and Matsouki, who shared a common household as husband and wife at all times relevant to the Complaint, were the beneficial owners of each other's shareholdings.  (*See* Pl. Opp. 9-10 (citing 17 C.F.R.

Plaintiff recognizes that rescission is the dispositive issue, but argues that he has plausibly alleged that neither abandonment nor the Rescission Agreement was capable of absolving Siokas of Section 16(b) liability. (*See* Pl. Opp. 1 n.1, 9). *First*, Plaintiff argues that rescission by abandonment based on failure to deliver the shares is ineffective, because Matsouki tendered payment for those shares in full and was irrevocably committed to the transaction. (*Id.* at 7-9). *Second*, Plaintiff argues that rescission by agreement cannot absolve Siokas of liability, because the Rescission Agreement was executed specifically so that Siokas could avoid paying short-swing profits to Cosmos. A rescission undertaken for such a purpose, Plaintiff contends, is incapable of accomplishing that result.

For the reasons that follow, the Court finds that Plaintiff has plausibly alleged that the rescission was ineffective and that the paired Matsouki Purchase and Siokas Sales resulted in a realized profit.

### a. Plaintiff Has Adequately Alleged That the October 2017 Purchase Was Complete When Payment Was Tendered

Defendants claim that Mavrogiannis never delivered the 100,000 shares of Cosmos stock that Matsouki bought in the Matsouki Purchase. (Def. Br. 9).[6]

---

§ 240.16a-1 ("The term indirect pecuniary interest in any class of equity securities shall include, but not be limited to: Securities held by members of a person's immediate family sharing the same household; provided, however, that the presumption of such beneficial ownership may be rebutted.")).

[6] For purposes of resolving the instant motion, the Court accepts the fact that Mavrogiannis never delivered the 100,000 shares to Matsouki, because this purported fact does not impact the outcome of the Court's decision. The Court notes, however, that Plaintiff has not alleged that the 100,000 shares were never delivered. (*See generally* Compl.). Defendants argue that the Court may take judicial notice of certain Securities and Exchange Commission ("SEC") filings that state that the shares were

According to Defendants, this failure to deliver the shares constituted an offer to rescind by Mavrogiannis, which Matsouki subsequently accepted by taking no further action to ensure compliance with the Purchase Agreement. (*Id.*) Thus, they conclude that no matching sale and purchase (or purchase and sale) occurred. (*See* Def. Br. 1, 6, 8-9). By contrast, Plaintiff argues that Matsouki was irrevocably bound to the Purchase Agreement at the time of its execution, and that delivery of the share certificates to Matsouki is of no consequence to a determination of when or whether the purchase took place. (*See* Compl. ¶¶ 11-14; Pl. Opp. 9, 13). For the reasons that follow, the Court disagrees with Defendants' interpretation of the transaction, and finds that Plaintiff has plausibly alleged that the Matsouki Purchase was complete upon signing.

Defendants' argument is premised upon Florida law,[7] where an "offer to rescind" is made by one party's refusal to comply with the terms of contract, and the other party to the contract "can complete the rescission by either acquiescing in the first party's refusal [to perform] or by declaring that the contract is at an end." *Gentry* v. *Smith*, 487 F.2d 571, 575 n.2 (5th Cir. 1973).

---

never transferred from Mavrogiannis to Matsouki. (Def. Br. 6-7). Plaintiff does not challenge this proposition and may thus have forfeited any objection to the Court's consideration of the same. But though the Court may take judicial notice of public filings, like SEC filings, to establish the fact that they contain information, it may not accept them as establishing the truth of the matters asserted therein. *Garber* v. *Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (summary order); *accord Staehr* v. *Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents." (emphasis omitted)).

[7]  The Purchase Agreement provides that it "shall be governed and construed in accordance with the laws of the State of Florida." (*See* Dkt. #1, Ex. A § 6.1).

11

(Def. Br. 8-9).  As an initial matter, whether or not the rescission was effective under Florida law does not affect the viability of Plaintiff's claim; what constitutes a "purchase" under the 1934 Act is a matter of federal law.  *See Morales* v. *Gould Inv'rs Tr.*, 445 F. Supp. 1144, 1151 (S.D.N.Y. 1977), *aff'd*, 578 F.2d 1369 (2d Cir. 1978) (determining that "it would be improvident" to determine whether a sales contract was binding under New York law, because the construction of the term "sales" within the 1934 Act is a question of federal law) (citation omitted); *see also Oliff* v. *Exch. Int'l Corp.*, 449 F. Supp. 1277, 1293 (N.D. Ill. 1978), *aff'd*, 669 F.2d 1162 (7th Cir. 1980) ("[I]f a violation of section 16(b) is otherwise shown, the fact that other state or federal laws may have affected a penalty or caused defendants in a section 16(b) proceeding to take a particular action does not prevent a finding of section 16(b) liability.").

Further to that point, Defendants' argument that Florida law requires delivery of shares to acquire title in the absence of the involvement of a broker is irrelevant for Section 16(b) purposes.  (*See* Def. Reply 7).  The terms "purchase" and "sale" as they appear in Section 16(b) "should be construed in a manner which will effectuate the purposes of the specific section of the Act in which they are used," even if that contrasts with the meaning given to the same terms in another context.  *See Morales*, 445 F. Supp. at 1151 (quoting *Bershad* v. *McDonough*, 428 F.2d 693, 696 (7th Cir. 1970)).

The Court thus looks not to Florida law, but to the 1934 Act, to determine whether a purchase occurred.  The 1934 Act provides that, "unless the context otherwise requires," the terms "buy" and "purchase" each

12

"include[s] any contract to buy, purchase, or otherwise acquire."  15 U.S.C. § 78c(a), (a)(13).  This language has been interpreted to make an individual a "purchaser" at the time when he or she "incur[s] an irrevocable liability to take and pay for the stock."  *Plumbers' Union Local No. 12 Pension Fund* v. *Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 177 (S.D.N.Y. 2010) (citing *Blau* v. *Ogsbury*, 210 F.2d 426, 427 (2d Cir. 1954)).  Thus, a stock is "purchased" within the meaning of Section 16(b) when "the investor becomes irrevocably committed to the transaction and, in addition, no longer has control over the transaction in any way that could be turned to speculative advantage by the investor."  *Prager* v. *Sylvestri*, 449 F. Supp. 425, 432-33 (S.D.N.Y. 1978).  At that moment, "the decision to invest is made and the power to manipulate the transaction is lost," and "[i]nsofar as the six-month rule is a presumption concerning the motivation of that decision, it is the moment of that decision that governs the construction of § 16(b)."  *Id.* at 433.  Federal courts have been clear that technicalities such as the passing of title or the exchange of the shares are, by themselves, of no import for Section 16(b) purposes.  *Id.*; *see also Connell* v. *Johnson*, No. 20 Civ. 1864 (LLS), 2020 WL 2748439, at *2 (S.D.N.Y. May 27, 2020).  And as the Supreme Court has noted, "the crucial point in the acquisition of securities is not the technical 'purchase' but rather the decision to make an acquisition."  *Foremost-McKesson,* 423 U.S. at 254 n.28.  This case law is consistent with the broad definition given to the word "purchase" in the 1934 Act.  *See* 15 U.S.C. § 78c(a)(13) ("The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire.").

13

Here, Plaintiff alleges, and the supporting documents establish, that Matsouki paid for the 100,000 shares of Cosmos stock prior to the execution of the Purchase Agreement.  (Dkt. #1, Ex. A § 2.ii; *id.*, Ex. B).  Accordingly, Matsouki made an irrevocable commitment to complete the transaction when she tendered this payment and entered into the Purchase Agreement.  *Cf. T-Bar Inc.* v. *Chatterjee*, 693 F. Supp. 1, 6 (S.D.N.Y. 1988) (holding that a purchaser in a registered public offering was not deemed to have made an irrevocable commitment until the final prospectus has been made available to him and he had a reasonable time after receipt to disaffirm his order).  There was nothing else Matsouki needed to do to complete the purchase: she fulfilled all of her obligations and pre-conditions and she had lost the power to refuse the purchased stocks and demand repayment.  *See Prager*, 449 F. Supp. at 432-33.  Any condition relating to delivery of the shares did not affect Matsouki's rights and obligations, because they were conditions to be fulfilled by Mavrogiannis.  *See Donoghue* v. *Local.com Corp.*, No. 07 Civ. 8550 (LBS), 2009 WL 260797, at *3-4 (S.D.N.Y. Feb. 3, 2009), *aff'd sub nom. Donoghue* v. *Hearst Commc'ns, Inc.,* 355 F. App'x 520 (2d Cir. 2009) (summary order) (recognizing the general rule that issuance of share certificates to third-party investors was not necessary to vest ownership; ownership was vested when full consideration was paid).

Thus, given the "longstanding rule that ownership is gained once the full consideration has been paid" and the lack of any further obligation on Matsouki's part to complete the purchase, Plaintiff has adequately alleged that

14

a Section 16(b) purchase occurred when the Purchase Agreement was signed, despite a subsequent failure to deliver the shares. *See Donoghue*, 2009 WL 260797, at *3-4 (explaining how ownership of a security does not turn on the possession of a share certificate because the issuance of a share certificate is merely an indicium of ownership); *see also In re Rappaport*, 487 N.Y.S.2d 376, 378 (2d Dep't 1985) ("When the consideration for shares has been paid in full, the subscriber is considered a holder of the shares and is entitled to all rights and privileges thereof."). Because delivery is not a required element for a purchase to be recognized under Section 16(b), the Complaint need not allege that delivery was satisfied.

### b. Plaintiff Has Adequately Alleged That the Rescission Agreement Does Not Preclude Section 16(b) Liability

Next, Defendants contend that even if the failure to deliver the share certificates did not rescind the Matsouki Purchase, the Rescission Agreement did. (*See* Def. Br. 9-10). Because the Rescission Agreement stated that the Matsouki Purchase was "void *ab initio*," Defendants believe there cannot be a matching purchase to any of the Siokas Sales, and consequently Siokas could not have realized any short-swing profits. (*Id.*). Plaintiff alleges that the purported rescission was undertaken for the express purpose of extinguishing Section 16(b) liability, and that such an undertaking is a nullity that must be disregarded in fixing liability and damages. (Compl. ¶ 18; Pl. Opp. 10-11). The parties seem to acknowledge that, if Plaintiff has plausibly alleged that the Rescission Agreement was a legal nullity, then the Complaint would state a

claim for Section 16(b) liability premised upon matching the Matsouki Purchase with the Siokas Sales.  (*See generally* Def. Br.).

The parties point to divergent strands of case law to reach their preferred conclusions.  (*See generally* Def. Br.; Pl. Opp.).  Yet the cases share one common thread: none stands for the proposition that the rescission of a Section 16(b) purchase or sale guarantees exculpation from Section 16(b) liability.  In determining the validity of a rescission, courts look to a variety of factors, perhaps the most important of which is the motive behind the purported rescission.  Courts have found rescissions that were entered into solely for the purpose of avoiding Section 16(b) liability to be invalid.  *See, e.g.*, *Volk* v. *Zlotoff*, 285 F. Supp. 650, 658 (S.D.N.Y. 1968) (holding that mutual rescission of a purchase did not immunize against liability under Section 16(b) when the rescission was entered into to avoid Section 16(b) liability); *Oliff*, 449 F. Supp. at 1293 (holding that mutual rescission of the acts of self-dealing made to avoid income tax liability is not a defense to Section 16(b)).  On the other hand, a rescission entered into based on other, benign motives may be found to be effective such that the rescinded purchase or sale is treated as having never occurred under Section 16(b).  *See, e.g.*, *Lewis* v. *Riklis*, 446 F. Supp. 582, 586 (S.D.N.Y.), *aff'd*, 575 F.2d 416 (2d Cir. 1978) (discussed further *infra*); *Morales* v. *Great American Corp.*, 445 F. Supp. 869, 871, 874 (M.D. La. 1978) (finding no Section 16(b) liability where sale of stock was mutually rescinded after it became apparent that a default on scheduled installment payments by the purchaser could produce adverse publicity for the issuer).

16

Plaintiff alleges that Matsouki rescinded the Purchase Agreement to avoid short-swing liability under Section16(b), and that such rescission must be treated as invalid.  (*See* Pl. Opp. 10-11 (citing Peter J. Romeo & Alan Dye, *Section 16(b) Treatise and Reporting Guide* (Summer 2019) (hereinafter, "Romeo & Dye")).  According to Plaintiff, factors such as the 604 days[8] between the Purchase Agreement and Rescission Agreement and the 135 days between Plaintiff's demand and the Rescission Agreement establish that Siokas and Matsouki were aware that the Purchase Agreement subjected them to Section16(b) liability, which itself suggests that the rescission was undertaken to avoid that liability.  (Compl. ¶ 18).  Defendants argue that the Purchase Agreement was not entered into to avoid liability, but based on genuine contract dispute: namely, that Mavrogiannis had failed to deliver the purchased stocks despite multiple demands from Matsouki.  (Def. Reply 5).

At this stage in the proceedings, the Court may not resolve the parties' dispute concerning Matsouki's motive in entering into the Rescission Agreement.  Plaintiff has alleged that Matsouki was motivated by the desire to avoid Section 16(b) liability, and the timing of the Rescission Agreement pushes Plaintiff's allegation into the realm of facial plausibility.  And determining the validity of Defendants' proffered defense — that the Rescission Agreement was

---

[8]     Plaintiff repeatedly highlights that the Rescission Agreement, which was executed on May 29, 2019, took place 574 days after the Purchase Agreement was executed on October 2, 2017.  However, the Court takes judicial notice of the accurate duration between the dates, which is 604 days, rather than 574.  Given that the time span is even longer, the Court assumes Plaintiff would make the same arguments using this accurate calculation.

the result of a *bona fide* contract dispute — would require the Court to resolve a question of fact, which it cannot do at this stage in the proceedings. *See generally Blau* v. *Albert*, 157 F. Supp. 816, 820 (S.D.N.Y. 1957) (denying a motion to dismiss where an issue of fact existed as to whether gifts of stock were *bona fide* under Section 16(b)); *Hammond Ford, Inc.* v. *Ford Motor Co.*, 204 F. Supp. 772, 776-77 (S.D.N.Y. 1962) ("[W]hether the defendant in good faith was asserting its claim to a general release [of all claims] so that it can be said that a *bona fide* dispute existed between the parties is itself a question of fact [].").

Even if the Court were to accept Defendants' arguments concerning the motive behind the Rescission Agreement, it is not clear that Defendants would be entitled to dismissal of the Complaint. Defendants rely principally upon *Riklis* for the proposition that an insider can avoid short-swing liability when his rescission is based on a *bona fide* contract dispute with a third-party. (*See* Def. Reply 2). At first glance, *Riklis* would appear to be analogous to this case, but a closer look reveals the narrow reach of its holding.

In *Riklis*, the defendant, an insider to a corporation, had entered into an agreement to sell the corporation's stock to a third party on June 25, 1973, and had purchased the corporation's stock on August 9 and September 28, 1973. *Riklis*, 446 F. Supp. at 583. Prior to any apparent demand for disgorgement of profits, the defendant filed a Form 4 Report with the Securities and Exchange Commission on November 7, 1973, stating that the June 25 sale "was subsequently rescinded as of the date of the sale." *Id.* The parties

disputed the validity of that rescission and whether it could absolve the defendant of Section 16(b) liability.  *Id.* at 583-85.

The *Riklis* court found that the rescission was effective, and cited a number of considerations in reaching that decision, including: (i) if the court were to void the rescission, the parties would be forced to complete a transaction that offended the "avowed purpose of section 16(b)" by producing the same short-swing profits that the statute seeks to deter; and (ii) no payments were made to the defendant, nor was any stock transferred in exchange, thus the defendant received no profits even though he thereafter purchased other shares at lower price than the price at which he had agreed to sell.  *Id.* at 586.  Based on these "unique circumstances", the court ultimately found no liability under Section 16(b) and granted summary judgment for the defendant.  *Id.*

While certain of the facts addressed in *Riklis* are also present here, and though the decision's logic is compelling, several factors distinguish *Riklis* from the case at bar.  *First*, in *Riklis*, no payments were made nor was any stock transferred pursuant to the defendant's sale agreement.  Thus, neither party performed their obligations or pre-conditions to the contract, rendering it "a still-executory contract to sell."  *Id.* at 586.  The *Riklis* court did not elaborate on the definition of a "still-executory contract," but the Second Circuit has referred to an executory contract as "a contract 'on which performance remains due to some extent on both sides.'"  *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 998-99 (2d Cir. 1996) (quoting *Nat'l Labor Relations Bd.* v. *Bildisco & Bildisco*,

465 U.S. 513, 522 n.6 (1984)) (establishing the meaning of executory contracts in the context of federal bankruptcy law).  Here, as discussed at length above, Matsouki had fulfilled her obligations under the Purchase Agreement by tendering payment in full, establishing her irrevocable commitment to the transaction.  In short, the Purchase Agreement was not an executory contract in the same manner as the *Riklis* agreement.

*Second*, the timing of the series of events at issue in *Riklis* is dissimilar to that in this case.  A mere three months separated the purported sale and the report of its rescission in *Riklis*.  Here, as Plaintiff explains, the Rescission Agreement was executed 604 days after the Purchase Agreement was executed and payment for the transaction was made in full.  (Compl. ¶¶ 15-19).  While it is unclear whether the *Riklis* plaintiff demanded that the issuing corporation recover any alleged profits prior to the defendant's rescission, the rescission here was asserted as a defense 135 days after Plaintiff made such a demand.  Though the Court makes no finding as to whether advance notice of the demand motivated the rescission, Siokas's knowledge of the demand for disgorgement gives credence to the allegation that the rescission was undertaken to avoid liability.[9]

---

[9]    Defendants argue that the considerable lapse in time between the Purchase Agreement and the Rescission Agreement was because Matsouki had made multiple demands for the shares to be delivered, which went unheeded for so long that Matsouki determined it would be better to rescind the purchase.  (Def. Reply 2, 6).  The Court makes no findings as to whether this is true, or whether the Rescission Agreement was a belated attempt to avoid liability.  At this stage in the proceedings, it finds only that Plaintiff has alleged facts that permit it to draw a reasonable inference that the Rescission Agreement was entered into to avoid liability.  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).

*Finally*, and perhaps most notably, the *Riklis* decision was rendered at a much later stage in the proceedings, upon a motion for summary judgment. *Riklis*, 446 F. Supp. at 583.  Here, the Court addresses a motion to dismiss, and must accept all plausibly pleaded allegations as true.  As such, the Court cannot engage in the sort of fact-intensive inquiry that permitted the *Riklis* court to find that the rescission agreement was valid.

For all of these reasons, the Court does not find the logic of *Riklis* to be controlling here.  Instead, the Court finds that the case it addresses is more analogous to that presented in *Volk* v. *Zlotoff,* where an insider was held liable for short-swing profits notwithstanding the fact that he had entered into a rescission agreement with the issuer that purported to void the exercise of his stock options.  285 F. Supp. 650 (S.D.N.Y. 1968).  The *Volk* court found that the fact that the defendants had paid in full for option shares and that the shares had been transferred to defendants' names suggested that the subject transaction was a "historical event that could not be wiped out" by mutual rescission;  "The corporation's [Section 16(b)] claim against the offending insiders was not subject to defeasance by the condition subsequent of a mutual rescission of one of the matching transactions."  *Id.* at 657.  While Matsouki never had the Cosmos shares transferred to her name, the fact that she paid in full for those shares similarly suggests that her purchase was final and could not be erased from history through a rescission.

Accepting as true all factual allegations in the Complaint and making all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has

plausibly alleged that the Rescission Agreement was incapable of nullifying the Matsouki Purchase.[10]  Thus, Plaintiff has stated a claim that the Matsouki Purchase and the Siokas Sales constituted matching transactions pursuant to Section 16(b).

### c.    Plaintiff Has Adequately Alleged That Siokas Realized a Profit

Lastly, Defendants assert that Plaintiff failed to state a claim under Section 16(b) because, even if a matching purchase and sale had taken place, the Rescission Agreement deprived Matsouki and Siokas of any profit.  (Def. Br. 7-11).  Defendants' argument on this point presupposes two facts: (i) the realization of profit is an element of a Section 16(b) violation; and (ii) the Rescission Agreement was effective to void the Matsouki Purchase.

At the outset, the Court notes that, in reciting the elements of a Section 16(b) violation, the Second Circuit routinely excludes realization of profits.  *See, e.g.*, *Olagues*, 902 F.3d at 125 ("Thus, to state a claim under the statute, a plaintiff must plausibly allege that "there was [i] a purchase and [ii] a sale of securities [iii] by an officer or director of the issuer or by a shareholder

---

[10]    The Court pauses to note that the parties have also pointed to a variety of other factors that may be considered in determining whether a rescission agreement is valid such that it can nullify a purchase or sale that would otherwise give rise to Section 16(b) liability.  (Pl. Opp. 10-11; Def. Reply 5-6 (citing Romeo & Dye)).  Certain of these factors would seem to favor Defendants' argument that the Rescission Agreement was valid.  *See* Romeo & Dye, *supra*, at 643 ("The mutual determination of the parties to rescind a purchase or sale may be an indication that the rescission was bona fide, rather than an effort by the insider to avoid liability.").  Others support Plaintiff's allegation.  *Id.* ("The greater the period between the actual transaction and its rescission, the less likely it is that a court will look with favor on the rescission.").  Weighing these factors would involve a fact-intensive inquiry that would be more suitably resolved at the motion for summary judgment stage of the proceedings.

who owns more than ten percent of any one class of the issuer's securities [iv] within a six-month period."); *see also Chechele*, 758 F.3d at 467; *Feder*, 220 F.3d at 32; *Gwozdzinsky* v. *Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998).  Nevertheless, Section 16(b) is plainly a mechanism by which to secure disgorgement of profits.  15 U.S.C. § 78p(b).  If there were no profits to disgorge, there would be no relief to grant under Section 16(b).  Further, the Second Circuit has found that, where a plaintiff "does not allege any facts that indicate that a profit was received, his [Section] 16(b) claim must fail." *S. & S. Realty Corp.* v. *Kleer-Vu Indus., Inc.*, 575 F.2d 1040, 1044 (2d Cir. 1978).  In light of this, the Court accepts that Plaintiff must plausibly allege that Siokas realized a profit under Section 16(b) for his claim to survive the motion to dismiss.

Even so, Defendants' argument must fail for precisely the same reason addressed above:  Plaintiff has plausibly alleged that the Rescission Agreement is incapable of absolving Defendants of liability.  It is true that, if the Rescission Agreement were effective, Matsouki would never have purchased the 100,000 of Cosmos shares at $2.20 a share, and thus could not have received a profit through a matching sale of those shares.  However, if the Rescission Agreement were treated as void for Section 16(b) purposes, then the return of shares from Matsouki to Mavrogiannis that it effectuated would be better viewed as a new agreement to sell:  Matsouki would be selling her right to the 100,000 shares back to Mavrogiannis for $22,000 — precisely the amount of money Matsouki initially paid for them.  This separate transaction would have

23

occurred nearly two years after the paired Matsouki Purchase and Siokas Sales and would be powerless to impact the profitability of those transactions.

### 2.     Plaintiff's Claim Does Not Suffer Due to the Presumption Against Extraterritoriality

Defendants briefly argue that a Section 16(b) violation cannot be alleged because the provision does not apply extraterritorially and the Purchase Agreement's notary stamp makes it "rather clear" that the transaction was effectuated in Greece.  (*See* Def. Br. 15).  To counter this, Plaintiff notes that the Purchase Agreement recites that it is to "be governed and construed in accordance with the laws of the State of Florida[,]" and that aside from the notary stamp, there is no other reason to believe it was executed in Greece (Dkt. #11).  Further, Plaintiff argues that, even if the Purchase Agreement were executed in Greece, the eight Siokas Sales all took place in the United States, so "every one of the transaction pairs had one leg firmly standing on U.S. soil." (Pl. Opp. 12).

Defendants have not cited to any case that squarely addresses whether Section 16(b) applies extraterritorially; instead the cases cited in Defendants' briefing deal with the extraterritorial application of Section 10(b) of the 1934 Act.  (*See* Def. Br. 15 (citing *Morrison* v. *Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010); *Parkcentral Glob. Hub Ltd.* v. *Porsche Auto. Holdings SE*, 763 F.3d 198, 210 (2d Cir. 2014)).  And the Court is unaware of any case that specifically addresses whether both halves of Section 16(b) matching transactions must have taken place within the United States for the statute to apply.  Without direct guidance on this point, the Court looks to the Supreme

24

Court's decision in *Morrison*, which addressed whether Section 10(b) of the 1934 Act applies to transactions that occurred outside the United States.

The Supreme Court held that Section 10(b) applies "only [to] transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Morrison*, 561 U.S. at 267.  *Morrison* indicates that the transactional test for defining the reach of Section 10(b) requires that either (i) a purchase or sale was made in the United States; or (ii) the transaction involves a security listed on a domestic exchange.  *Id.* at 269-70 ("The transactional test we have adopted [is] whether the purchase or sale is made in the United States, *or* involves a security listed on a domestic exchange[.]" (emphasis added)).  Other interpretations of *Morrison* confirm this understanding.  *See SEC* v. *Ahmed*, 308 F. Supp. 3d 628, 657 (D. Conn. 2018) (citing *Morrison*, 561 U.S. at 267 ("[T]he SEC also must establish that the transactions at issue were either listed on domestic exchanges, or that the purchase or sale occurred in the United States.")).

Applying the Supreme Court's Section 10(b) test to Section 16(b), the Court finds that Plaintiff has plausibly alleged that Section 16(b) would apply to the alleged misconduct for two reasons.  *First*, Plaintiff argued in its opposition papers that, even under *Morrison*, only one half of the purchase-and-sale or sale-and-purchase transaction that resulted in a short-swing profit would need to occur in the United States for the presumption against extraterritoriality to be satisfied.  (Pl. Opp. 12).  And Defendants have not challenged the sufficiency of the pleadings concerning whether the Siokas Sales

occurred in the United States.  Plaintiff's argument (though cursorily briefed) raises a complex question of law, requiring statutory construction of the Exchange Act.  But Defendants failed to address Plaintiff's argument in their reply papers.  Indeed, nowhere have Defendants presented any argument that both the purchase and sale comprising a short-swing profit violation would need to occur in the United States to satisfy the principles espoused in *Morrison.*  The Court declines to make Defendants' arguments for them.

*Second*, the Complaint alleges that Cosmos is a domestic corporation whose stock is listed and traded on the OTCQB market through domestic market makers and facilities.  (Compl. ¶ 3).  To the Court's eye, drawing inferences in Plaintiff's favor, this would constitute an allegation that Cosmos is traded on a domestic exchange, thus satisfying the second prong of *Morrison*'s transactional test.  *See Morrison*, 561 U.S. at 267-70.  Defendants do not argue that Plaintiff has failed to adequately allege that Cosmos stock is traded on a domestic exchange.  (*See generally* Def. Br.; Pl. Opp.).  Once again, in failing to address this question, Defendants have opted not to wade into a complicated area of law.  *See Absolute Activist Value Master Fund Ltd.* v. *Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012) (noting that, in *SEC* v. *Ficeto,* 839 F. Supp. 2d 1101, 1112 (C.D. Cal. Dec. 20, 2011), the SEC had successfully argued that *Morrison* was satisfied because the case involved securities traded over a different over-the-counter securities market); *but see Stoyas* v. *Toshiba Corp.*, 896 F.3d 933, 947 (9th Cir. 2018) (reversing *SEC* v. *Ficeto* and finding that the over-the-counter securities market in question was not an exchange and thus

26

could not be classified as a "domestic exchange" under *Morrison*).  And again, the Court declines to make arguments for dismissal that Defendants chose not to present.

## CONCLUSION

For the reasons explained above, Defendants' motion to dismiss is DENIED.  The Clerk of Court is directed to terminate the motion at docket entry 20.

Defendants are hereby ORDERED to submit an answer to claims remaining in Plaintiff's Complaint on or before **July 31, 2020**.

The parties are hereby ORDERED to confer and submit a proposed case management plan on or before **August 7, 2020**.

SO ORDERED.

Dated:     July 10, 2020
           New York, New York

_____
       KATHERINE POLK FAILLA
       United States District Judge

27